UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BARRINGTON CLIVE CAMPBELL,

                                    Petitioner,

            -against-

JUDITH ALMODOVAR, *New York Field Office Director, U.S. Immigration and Customs Enforcement*; TODD LYONS, *Acting Director, U.S. Immigration and Customs Enforcement*; KRISTI NOEM, *Secretary, U.S. Department of Homeland Security*,

                                    Respondents.

---

Case No. 1:25-cv-09509 (JLR)

<u>**OPINION AND ORDER**</u>

JENNIFER L. ROCHON, United States District Judge:

Petitioner Barrington Clive Campbell ("Campbell" or "Petitioner") petitions, through counsel, for a writ of habeas corpus under 28 U.S.C. § 2241, challenging the lawfulness of his detention by U.S. Department of Homeland Security ("DHS") agents and seeking, *inter alia*, his release from DHS custody.  *See generally* Dkt. 1 ("Petition" or "Pet."").  For the reasons stated below, his Petition is GRANTED.

## BACKGROUND

### I.  Relevant Statutory Framework

The Immigration and Nationality Act ("INA") and its implementing regulations set forth the procedures for detaining, paroling, and removing inadmissible noncitizens from the United States.  "[O]ur immigration laws have long made a distinction between those [noncitizens] who have come to our shores seeking admission . . . and those who are within the United States after entry, irrespective of its legality."  *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958).  Recognizing this dichotomy, the INA "authorizes the [g]overnment to detain certain

[noncitizens] *seeking admission into* the country under §§ 1225(b)(1) and (b)(2).  It also authorizes the [g]overnment to detain certain [noncitizens] *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)."  *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018) (emphasis added).  Detention is mandatory for the former but discretionary for the latter.  Importantly, "a noncitizen cannot be subject to both mandatory detention under § 1225 and discretionary detention under § 1226."  *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 485 (S.D.N.Y. 2025).

**A.    Mandatory Detention Under Section 1225(b)(2)**

Section 1225(b)(2)(A) provides that "in the case of [a noncitizen] who is an applicant for admission, if the examining immigration officer determines that [a noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] *shall* be detained" pending removal proceedings.  8 U.S.C. § 1225(b)(2)(A) ("§ 1225" or "§ 1225(b)(2)") (emphasis added).  Thus, for § 1225's mandatory detention requirement to apply, an "'examining immigration officer' must determine that the individual is: (1) an 'applicant for admission'; (2) 'seeking admission'; and (3) 'not clearly and beyond a doubt entitled to be admitted.'"  *Lopez Benitez*, 795 F. Supp. 3d at 487 (quoting *Martinez v. Hyde*, 792 F. Supp. 3d 211, 214 (D. Mass. 2025)); *J.G.O. v. Francis*, No. 25-cv-07233 (AS), 2025 WL 3040142, at *2-3 (S.D.N.Y. Oct. 28, 2025).  With the narrow exception of temporary parole under 8 U.S.C. § 1182(d)(5)(A), "there are no other circumstances under which [noncitizens] detained under § 1225(b) may be released." *Jennings*, 583 U.S. at 300 (emphasis omitted).

Pursuant to § 1182(d)(5)(A), noncitizens detained following inspection under § 1225 can be paroled into the United States "for urgent humanitarian reasons or significant public benefit," based on a "case-by-case" assessment by DHS.  § 1182(d)(5)(A).  Notably, humanitarian or

public interest parole may only be granted "provided the [noncitizen] present[s] neither a security risk nor a risk of absconding."  *See* 8 C.F.R § 212.5(b).

Parole under 1182(d)(5)(A) is temporary.  It may terminate "automatically" upon the noncitizen's "departure from the United States" or "at the expiration of the time for which parole was authorized."  8 C.F.R. § 212.5(e)(1).  Alternatively, it may terminate "upon written notice to the [noncitizen]."  § 212.5(e)(2)(i).  In the latter case, a "charging document," such as a Notice to Appear ("NTA"), may act as "written notice" if it is "served on the [noncitizen]."  *Id.*; *see also* 8 C.F.R. § 244.1 (defining the term "[c]harging document" to include a "Notice to Appear").  Once parole terminates, § 1182(d)(5)(A) requires the noncitizen to "forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."  8 U.S.C. § 1182(d)(5)(A).

Accordingly, the end of parole — notwithstanding the method of termination — triggers processing under 8 C.F.R. § 212.5(e)(2).  *See* 8 C.F.R. § 212.5(e)(1)(ii) ("[T]he [noncitizen] shall be processed in accordance with paragraph (e)(2) of this section except that no written notice shall be required.").  Under § 212.5(e)(2), a noncitizen is "restored to the status that he or she had at the time of parole," and "[a]ny further inspection or hearing shall be conducted under section 235 or 240 of the [INA] and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed."  § 212.5(e)(2)(i).

### i.    Removal Proceedings Under 8 U.S.C. § 1229a

Section 240 of the INA, codified at 8 U.S.C. § 1229a, governs removal proceedings. DHS begins Section 240 proceedings by serving the noncitizen with an NTA, which DHS must also file in an immigration court.  *See* 8 U.S.C. § 1229(a)(1); 8 C.F.R. § 1239.1(a).  The NTA informs the noncitizen of, *inter alia*, "[t]he charges against the [noncitizen]," "the statutory

provisions alleged to have been violated," and "[t]he time and place at which the proceedings will be held."  §§ 1229(a)(1)(D), (G)(i).  During the proceedings, the noncitizen may apply for relief or protection from removal, including asylum, withholding of removal, and protection under the Convention Against Torture.  *See* 8 U.S.C. §§ 1158(a), 1231(b)(3); 8 C.F.R. § 208.16. "If the immigration judge decides that the [noncitizen] is inadmissible or deportable and that the [noncitizen] is not entitled to any of the relief or protection that he requested, the immigration judge will issue an order of removal."  *Johnson v. Guzman Chavez*, 594 U.S. 523, 528 (2021); *see also* 8 U.S.C. §§ 1229a(a)(1), 1101(b)(4).  If the immigration judge so orders, the noncitizen may petition the judge for reconsideration, 8 U.S.C. § 1229a(c)(6), or appeal the removal order to the Board of Immigration Appeals ("BIA"), 8 C.F.R. §§ 1003.1(b), 1003.38(a).  If the BIA affirms the removal order, the noncitizen may appeal the decision to a United States court of appeals, 8 U.S.C. § 1252(a), and thereafter seek the Supreme Court's review, 28 U.S.C. § 1254(1).

### B.    Discretionary Detention Under Section 1226(a)

Section 1226 governs the detention of noncitizens "inside the United States," *Jennings*, 583 U.S. at 288, who are awaiting "a decision on whether [they are] to be removed from the United States," 8 U.S.C. § 1226(a).  There are two categories of detention under the statute.

The first category, established by Section 1226(a), provides that "[o]n a warrant issued by the Attorney General, [a noncitizen] may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States."  8 U.S.C. § 1226(a) ("§ 1226" or "§ 1226(a)").  Under this "discretionary detention framework," *Lopez Benitez*, 795 F. Supp. 3d at 484 (quoting *Gomes v. Hyde*, --- F. Supp. 3d ---, 2025 WL 1869299, at *1 (D. Mass. July 7, 2025)), DHS may (1) continue to detain the noncitizen; (2) release the noncitizen on bond; or (3) release the noncitizen on conditional parole, 8 U.S.C. § 1226(a)(1)-(2).  When DHS exercises its

discretion to detain, "§ 1226(a) and its implementing regulations require [DHS] to make an individualized custody determination." *Velasaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2000), *appeal withdrawn sub nom. Velasaca v. Wolf*, No. 20-2153, 2020 WL 7973940 (2d Cir. Oct. 13, 2020). Moreover, § 1226(a)'s implementing regulations mandate that DHS officers base their individualized determination on two factors: (1) whether the noncitizen is a "danger to property or persons" and (2) whether the noncitizen is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). If, after conducting such an assessment, DHS ultimately decides to detain the noncitizen, that noncitizen has a right to appeal that decision before an immigration judge, who must consider the same two factors. *See* 8 C.F.R. §§ 1003.19(d),(e) (allowing immigration judges to review bond and custody determinations); *Matter of Siniauskas*, 27 I. & N. Dec. 207, 207 (BIA 2018) ("[A noncitizen] in a custody determination under [§ 1226], must establish to the satisfaction of the Immigration Judge and the Board that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight.").

The second category, established by Section 1226(c), provides that DHS "shall take into custody any [noncitizen]" who falls under certain enumerated categories related to criminal and terrorist activity. 8 U.S.C. § 1226(c)(1). This "mandatory detention framework . . . 'carves out a statutory category of [noncitizens] who may *not* be released' from detention pending the conclusion of their removal proceedings.'" *Rodriguez-Acurio v. Almodovar*, --- F. Supp. 3d ---, 2025 WL 3314420, at *10 (E.D.N.Y. Nov. 28, 2025) (emphasis in original) (quoting *Jennings*, 583 U.S. at 289).

### C. Factual Background

Campbell is a citizen of Jamaica. Pet. ¶ 16; Dkt. 10 ("Hampton Decl.") ¶ 3. On August 4, 2021, he presented himself to a U.S. Border Patrol officer at the San Ysidro, California port of

entry, whereupon he sought entry into the United States and declared his fear of returning to

Jamaica.  Pet. ¶ 2; Hampton Decl. ¶ 4.[1]  U.S. Customs and Border Protection ("CPB") deemed

that Campbell was inadmissible, served him with an NTA, and paroled him into the United

States on humanitarian grounds pursuant to § 1182(d)(5)(A).  Pet. ¶ 2; Hampton Decl. ¶¶ 5-6, 10;

Dkt. 11-1 ("2021 NTA").  Campbell's parole was to expire automatically on August 2, 2022.

Dkt. 1-2.  However, DHS never filed Campbell's 2021 NTA with the Executive Office for

Immigration Review, so the government never commenced removal proceedings.  Hampton

Decl. ¶ 5; *see Öztürk v. Hyde*, 136 F.4th 382, 397-98 (2d Cir. 2025) (observing that removal

proceedings had not commenced before the government filed an NTA).  For four years,

Campbell lived in the United States without any pending removal proceedings against him.  He

applied for asylum,[2] obtained a work permit that allowed him to lawfully work in the United

States,[3] complied with the terms of his release, updated immigration authorities with his current

address, and built a life for himself in New York.  Pet. ¶ 5.  In short, he did "everything DHS and

the immigration court [] asked him to do."  *Id.* ¶ 32.

Nevertheless, on September 15, 2025, DHS served Campbell with a new NTA, charging

him as inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I).  Hampton Decl. ¶ 9; Pet ¶ 27; Dkt. 11-

2 ("2025 NTA").  DHS filed the NTA with the Executive Office for Immigration Review that

---

[1] Nothing in the record before the Court indicates that Campbell received a credible fear
interview — to which he was statutorily entitled.  *See* 8 U.S.C. § 1225(b)(1)(A)(ii).

[2] Campbell applied for asylum on August 1, 2022, one day before his parole expired.  Pet. ¶ 26.
The conclusion of Campbell's one-year parole coincided with his one-year asylum application
deadline.  *See* 8 U.S.C. § 1158(a)(2)(B).  Because his NTA was never filed, Campbell was not in
removal proceedings before an immigration judge, and, accordingly, was able to file an
affirmative asylum application.  *See generally* Dkt. 1-4.

[3] Petitioner represented at his hearing before this Court that he had applied for and obtained a
work permit prior to his 2025 detention.  He also confirmed that he provided updated address
information to DHS.  Respondents do not dispute these facts.

same day, thereby finally commencing Section 240 removal proceedings against Campbell.

Hampton Decl. ¶ 9; Pet ¶ 27.  The 2025 NTA directed Campbell to appear for a hearing on

October 15, 2025 before an immigration judge.  *See* 2025 NTA at 1.  Approximately two weeks

before Campbell was set to appear, the immigration judge adjourned the hearing to March 3,

2027 — delaying any decision on Campbell's removal for nearly two years.  Hampton Decl.

¶ 10; Pet. ¶ 28.

Despite that, on October 22, 2025, DHS mailed Campbell a Call-in Letter directing him

to report to the Immigration and Customs Enforcement ("ICE") field office at 201 Varick Street

on November 13, 2025 for a "case review."  Hampton Decl. ¶ 11; Pet. ¶ 30; Dkt. 1-8 ("Call-in

Letter").  As he had done with every other DHS directive, Campbell complied.  When he arrived

at the ICE field office on November 13, 2025, DHS officers served Campbell with a Form I-200,

Warrant for Arrest, pursuant to § 1226(a).  Dkt. 11-3 ("Warrant").[4]  Thereafter, Campbell alleges

that DHS agents "abruptly arrested him, revoked his release, and re-detained him" without a

"meaningful opportunity to contest his redetention."  Pet. ¶ 6.[5]

Campbell filed his Petition and eight accompanying exhibits on November 13, 2025,

Dkts. 1-1–1-8, the same day he was taken into immigration custody at 201 Varick St., New

York, New York.  Pet. ¶ 31; Hampton Decl. ¶ 12.  On November 24, 2025, Respondents filed a

"Return to Habeas Petition," Dkt. 11 ("Return"), which included accompanying exhibits,

Dkts. 11-1–11-3, a Declaration of Supervisory Detention and Deportation Officer Lige Hampton,

---

[4] On its face, the warrant reads that Campbell was arrested pursuant to "sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations," which correspond to 8 U.S.C. §§ 1226 and 1357 and 8 C.F.R. §§ 287.1-287.2.  *See* Warrant at 1.

[5] At some time following Campbell's detention, his March 3, 2027 hearing was rescheduled to December 2, 2025.  Hampton Decl. ¶ 16.  That hearing was again adjourned not long after to December 16, 2025 to allow Campbell's counsel additional time to prepare.  Dkt. 14.

*see* Hampton Decl., and a memorandum of law in opposition to the Petition, Dkt. 9 ("Opp."). On November 28, 2025, Campbell filed his reply. Dkt. 12 ("Reply"). Later, on December 7, 2025, Campbell filed supplemental briefing on the application of § 1226(a) to his re-detention. Dkt. 15 ("Br."). On December 8, 2025, the Court held a hearing on the habeas petition ("Hearing"). Because Campbell's supplemental briefing was filed on the evening before the Hearing, the Court afforded Respondents until December 10, 2025, to file a response, if any, to the supplemental submission. Respondents represented in a letter dated December 8, 2025, that they would rest on the arguments presented at the Hearing and would not file additional briefing. Dkt. 16. Campbell is currently detained in the Metropolitan Detention Center ("MDC") in Brooklyn, New York, where DHS transferred him on November 14, 2025. Hampton Decl. ¶ 15.

## LEGAL STANDARD

Campbell brings a petition for a writ of habeas corpus under 28 U.S.C. § 2241, which "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or law or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)). "Federal courts have jurisdiction to hear habeas corpus claims by non-citizens challenging the constitutionality of their detention." *Lopez v. Sessions*, No. 18-cv-04189 (RWS), 2018 WL 2932726, at *6 (S.D.N.Y. June 12, 2018) (citing *Demore v. Kim*, 538 U.S. 510, 516-17 (2003)); *see also Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020).

## DISCUSSION

The Petition presents three issues: (1) whether Campbell is detained pursuant to § 1225(b)(2), which requires *mandatory* detention of noncitizens "seeking admission" to the country, or pursuant to § 1226(a), which provides for *discretionary* detention of noncitizens "pending a decision on whether [they are] to be removed from the United States"; (2) whether if

Campbell is detained under § 1226, his detention without an individualized assessment of his flight risk or dangerousness violates the Due Process Clause; and (3) if his detention violates the Due Process Clause, whether the Court may grant his requested relief of release from DHS custody or if administrative exhaustion, in the form of a bond hearing before an immigration judge, is required.  The Court addresses each issue in turn.  Before addressing the merits of Campbell's claim, however, the Court briefly discusses jurisdiction, which Respondents do not contest.

## I.    Jurisdiction

The Court, mindful of its obligation to ensure that it has jurisdiction, begins by addressing two jurisdictional issues before turning to whether Campbell is entitled to relief.

First, the Court may consider the Petition even though Campbell has now been transferred to the MDC, which is in the Eastern District of New York.  Habeas petitioners challenging their physical custody within the United States must "file the petition in the district of confinement." *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004).  Here, jurisdiction in this District was proper at the outset because Campbell remained in this District until November 14, 2025, the day after he filed the Petition.  *See* Hampton Decl. ¶¶ 14, 15.[6]  The Court therefore retains jurisdiction despite Campbell's transfer to MDC.  *See, e.g.*, *Khalil v. Joyce*, 771 F. Supp. 3d 268, 279, 289 (S.D.N.Y. 2025) (reasoning that "at the time of the bringing of the action, habeas jurisdiction lies in only one district: the district of confinement," and "a prisoner's

---

[6] Respondents report that Campbell was first transported from 201 Varick Street to Delaney Hall Detention Facility in Newark, New Jersey "for further processing" on November 13, 2025. Hampton Decl. ¶ 14.  By 7:08 p.m., Campbell had again been transferred — now to 26 Federal Plaza, which is in this District.  *Id.*  Campbell's counsel filed his Petition while Campbell was detained in 26 Federal Plaza.  *See* Dkt. 1-1.

transfer after a petition is filed does not deprive a court that would otherwise have jurisdiction of the ability to adjudicate his petition").

Second, the Court may consider the constitutional challenge raised in the Petition, as it does not run afoul of 8 U.S.C. § 1252's jurisdiction-stripping clauses.  Section 1252(g) states that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any [noncitizen] arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any [noncitizen] under this chapter."  8 U.S.C. § 1252(g).  However, section 1252(g)'s "bar on jurisdiction is 'narrow[ ],'" *Öztürk*, 136 F.4th at 396 (alteration in original) (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999)), and "does not preclude jurisdiction over the challenges to the legality of [a noncitizen's] detention," *id.* at 397 (alteration in original) (quoting *Kong v. United States*, 62 F.4th 608, 609 (1st Cir. 2023)).  Thus, "[e]ven though, '[i]n a but-for sense,' a claim of unlawful detention might arise from the government's decision to commence proceedings, adjudicate a case, or execute a removal, challenges to unlawful detention 'do not "arise from" the government's decision to "execute removal orders" within the meaning of § 1252(g) simply because the claims relate to that discretionary, prosecutorial decision.'"  *Id.* (second alteration in original) (quoting *Kong*, 62 F.4th at 613).  Here, Campbell's claims are collateral to Respondents' decision to commence removal proceedings against him, and instead involve whether Respondents' actions accorded with their own procedures and the Constitution.  *See You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 457 (S.D.N.Y. 2018) (finding that respondents' actions "fall[] outside the ambit of § 1252(g)" because the "[t]he question before the [c]ourt is not why the Secretary chose to execute the removal order" but rather "whether the way [r]espondents acted accords with the Constitution"); *Prado v. Perez*, 451 F. Supp. 3d 306, 312 (S.D.N.Y. 2020) ("[C]ourts in this district have found that there is no deprivation of jurisdiction

to hear claims arising from unlawful arrest or detention, because those claims are too distinct to be said to 'arise from' the commencement of removal proceedings."). Thus, section 1252(g) does not preclude the Court's exercise of jurisdiction here.

## II. Petitioner Is Detained Under § 1226(a)

Respondents assert that § 1225(b)(2) mandates Campbell's detention. Opp. at 8. In response, in his supplemental submission, Campbell argues that § 1226(a) governs his detention because his circumstances mirror those in *Rodriguez-Acurio v. Almodovar*, No. 25-cv-06065 (NJC), 2025 WL 3314420 (E.D.N.Y. Nov. 28, 2025). *See generally* Br. The Court agrees with Campbell. Recognizing that decisions by other district judges are not binding, however, the Court independently analyzes whether Campbell's detention falls under § 1225(b)(2) or § 1226(a).

### A. Section 1225(b) Does Not Apply to Campbell's Detention

As always, statutory interpretation begins with the statutory text. "Our starting point in statutory interpretation is the statute's plain meaning, if it has one." *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000). Mandatory detention under § 1225 is premised on an immigration officer's determination that a noncitizen is: (1) an "applicant for admission"; (2) "seeking admission"; and (3) "not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A); *see also Lopez Benitez*, 795 F. Supp. 3d at 487; *J.G.O.*, 2025 WL 3040142, at *2-3. At the time of his 2025 re-arrest, Campbell did not meet all three criteria, so he could not have been detained under § 1225. In reaching its conclusion, the Court need only address, and distinguish between, the first two criteria.

Campbell was, and remains, "an applicant for admission." "[A]pplicant for admission" is a term of art that covers both noncitizens who "arrive[] in the United States" and those already "present in the United States who ha[ve] not been admitted." 8 U.S.C. § 1225(a)(1); *West*

*Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 91 n.5 (1991) (noting that terms of art "*depart*

from ordinary meaning*").  "Admitted" is in turn defined as having gained "lawful entry . . . into

the United States after inspection and authorization by an immigration officer."  8 U.S.C.

§ 1101(a)(13)(A).

Here, Campbell remained an "applicant for admission" despite having been paroled.

Section 1182(d)(5)(A) specifically provides that "parole . . . shall not be regarded as an

admission of the [noncitizen]."  8 U.S.C. § 1182(d)(5)(A).  The applicable DHS regulation

further provides that once a noncitizen's parole terminates, he is "restored to the status that

he . . . had at the time of parole," 8 C.F.R. 212.5(e)(2)(i) — that of an applicant for admission.

*See, e.g.*, *United States v. Balde*, 943 F.3d 73, 84 (2d Cir. 2019) ("Parole does not change

parolees' immigration status: they . . . are treated as applicants for admission into the country.").

Thus, at the time of his 2025 re-arrest, Campbell was "present in the United States" and "ha[d]

not been admitted," making him an applicant for admission.  8 U.S.C. § 1225(a)(1).

However, though he remained an applicant for admission, Campbell was no longer

"seeking admission" at the time of his 2025 re-arrest and detention.  Unlike "applicant for

admission," "seeking admission" has no statutory definition.  Determining the plain meaning of

the phrase is straightforward.  *See United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016)

("Where, as here, there is no statutory definition of a term, we consider 'the ordinary, common-

sense meaning of the words.'" (quoting *Dauray*, 215 F.3d at 260)); *id.* ("If the meaning is plain,

the inquiry ends there.").  First, to "seek" is "to ask for" or "to try to acquire or gain."  *Seek*,

*Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/seek (last visited

Dec. 9, 2025).  The use of a present participle, "seeking," "necessarily implies some sort of

present-tense action."  *Lopez Benitez*, 795 F. Supp. 3d at 488 (quoting *Martinez*, 792 F. Supp. 3d

at 218 ); *see also J.G.O.*, 2025 WL 3040142, at *3; *Tumba Huamani v. Francis*, No. 25-cv-

08110 (LJL), 2025 WL 3079014, at *3 (S.D.N.Y. Nov. 4, 2025).  Next, the applicant must be seeking "admission," which is statutorily defined as "lawful entry . . . into the United States."  8 U.S.C. § 1101(a)(13)(A).  "Entry" is not defined in the INA, *see generally id.* § 1101, so it can be given its "ordinary, contemporary, common meaning," *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).  That meaning is "[t]he action or an act of entering a place."  *Entry*, *Oxford English Dictionary*, https://doi.org/10.1093/OED/8274517121 (last visited Dec. 9, 2025); *see also Entry*, *Black's Law Dictionary* (12th ed. 2024) ("Any entrance of [a noncitizen] into the United States, whether voluntary or involuntary.").  Entry therefore implies a geographic limit of entering a place, here the United States's entrance (*i.e.*, the border).  All combined, "seeking admission" means presently trying to enter the United States at or near the border.  *See J.G.O.*, 2025 WL 3040142, at *3 (noting that "seeking admission" would "require[] [a noncitizen] . . . to want to *go into* the country"); *Alvarez Ortiz v. Freden*, --- F. Supp. 3d ---, 2025 WL 3085032, at *7 (W.D.N.Y. Nov. 4, 2025) (observing that "seeking admission" "must refer to seeking physical entry at the border, not the legal right to enter"); *Hyppolite v. Noem*, No. 25-cv-04304 (NRM), 2025 WL 2829511, at *9 (E.D.N.Y. Oct. 6, 2025) (finding that "seeking admission" "refer[s] to those who are presenting themselves at the border, or who were recently apprehended just after entering").  In sum, when DHS agents detained Campbell in 2025, he was no longer seeking to enter the country.  He was already in — and had been for several years.  *See Lopez Benitez*, 795 F. Supp. 3d at 489 (holding that because "§1225(b)(2)(A) applies only to those noncitizens who are actively 'seeking admission' to the United States, it cannot, according to its ordinary meaning, apply to [the petitioner], because he has already been residing in the United States for several years"); *Rodriguez-Acurio*, 2025 WL 3314420, at *16 n.6 ("[A]lthough a Section 1182(d)(5)(A) parolee remains 'at the border' in the sense that they remain an applicant for admission, these

parolees have nevertheless entered into the United States by virtue of their parole . . . .").  If anything, Campbell was seeking "to obtain a lawful means to *remain* here" through his asylum application.  *Lopez Benitez*, 795 F. Supp. 3d at 488 n.7.  Therefore, § 1225 does not apply to him.

To disregard the "seeking admission" requirement, as Respondents urge, would be to violate the rule against surplusage twice-over.  *See United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) ("'[E]very clause and word of a statute' should have meaning." (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)).  "If, as Respondents argue, § 1225[] were intended to apply to all 'applicant[s] for admission,' then there would be no need to include the phrase 'seeking admission' in the statute."  *Lopez Benitez*, 795 F. Supp. 3d at 488.  That is, § 1225 would simply read: "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that [the] alien ~~seeking admission~~ is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained."  "Seeking admission" would be mere surplusage of the "applicant" requirement, 8 U.S.C. § 1225(b)(2)(A), in contravention of the canons of interpretation, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("[N]o clause, sentence, or word shall be superfluous, void, or insignificant." (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))); *see also Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 21 (2d Cir. 2022) (describing the "meaningful-variation canon" as "the principle that 'where a statutory scheme has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea'" (alterations adopted) (quoting *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022))).

Respondents' reading of § 1225 would likewise render superfluous the mandatory detention provisions found in § 1226(c)(1)(A), (D), and (E).  Section 1226(c)(1)(A) mandates detention for "any [noncitizen] who is inadmissible by reason of having committed an offense covered in section 1182(a)(2) of this title," such as offenses related to controlled substances.  8

U.S.C. § 1226(c)(1)(A); 8 U.S.C. § 1182(a)(2)(A)(i)(II).  "[T]his mandatory detention under § 1226(c) would be unnecessary if all persons who have not been admitted into the United States were already subject to § 1225(b)'s mandatory detention provisions."  *J.U. v. Maldonado*, No. 25-cv-04836 (OEM), 2025 WL 2772765, at *8 (E.D.N.Y. Sept. 29, 2025) (quoting *Hasan v. Crawford*, --- F. Supp. 3d ---, 2025 WL 2682255, at *9 (E.D. Va. Sept. 19, 2025)).  The Laken Riley Act, which amended § 1226 earlier this year, would likewise be rendered purposeless.  *See* Pub. L. No. 119-1, § 2, 139 Stat. 3 (2025) (codified as amended at 8 U.S.C. § 1226(c)(1)(E)). The Act makes noncitizens subject to mandatory detention if (1) they are inadmissible under certain provisions of 8 U.S.C. §§ 1182(a) and (2) are charged with, arrested for, convicted of, or admit to having committed certain crimes.  8 U.S.C. § 1226(c)(1)(E).  Under this amendment, Congress intended for mandatory detention to be triggered only when the inadmissibility *and* the criminal conduct criterion are met.  But anyone who is "inadmissible under paragraph (6)(A), (6)(C) or (7) of section 1182(a)" is, by definition, an "applicant for admission," which would mean that they were already covered under Respondents' reading of § 1225 — without any additional criminal conduct requirement.  *Id.*; *see* 8 U.S.C. § 1182(a).  In other words, the text added by the Laken Riley Act would be almost entirely redundant.[7]  *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."); *see also Bilski v. Kappos*, 561 U.S. 593, 608 (2010) ("[The canon against surplusage], of course, applies to interpreting any two provisions in the U.S.[]Code, even when Congress enacted the provisions at different times."); *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a

---

[7] The Act could perhaps still apply to visa overstays, as those noncitizens would have been lawfully admitted but remained present unlawfully.  However, in enacting the Laken Riley Act, "there is no indication that Congress intended § 1226 to be [so] limited . . . ."  *Lopez Benitez*, 795 F. Supp. 3d at 490.

statute, we presume it intends its amendment to have real and substantial effect.").  Accordingly, the Court concludes that Congress intended for § 1226(a)'s discretionary framework to apply to noncitizens arrested on a warrant while residing in the United States, except as provided in § 1226(c).  It follows, then, that DHS detained Campbell under § 1226(a).[8]

Respondents' arguments to the contrary are unavailing.  First, Respondents invoke 8 C.F.R. § 212.5(e)(2)(i) to argue that Campbell's parole did not change his "status" as an "applicant for admission."  Opp. at 8 n.2.  As discussed, however, applicants for admission are not necessarily seeking admission.  *Lopez Benitez*, 795 F. Supp. 3d at 488.  Thus, while Campbell's status as an applicant for admission remained unchanged, the record makes clear that he was no longer "seeking admission" at the time of his re-arrest, rendering § 1225(b)(2)'s mandatory detention provision inapposite.

Second, Respondents, citing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) and *DHS v. Thuraissigiam*, 591 U.S. 103 (2020), argue that Campbell must be detained under § 1225 because of the "entry fiction" doctrine.  Opp. at 9, 9 n.4.  Under the entry fiction, "[noncitizens] who have been denied admission to the United States yet are present within its border are 'treated, for constitutional purposes, as if stopped at the border.'"  *Traore v. Ahrendt*, No. 18-cv-00794 (JMF), 2018 WL 2041710, at *1 n.2 (S.D.N.Y. Apr. 30, 2018) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).  "[T]he fiction stretches to noncitizens stopped at or near the border," *J.G.O.*, 2025 WL 3040142, at *4, as well as those in the United States who have been paroled under § 1225, *Traore*, 2018 WL 2041710, at *1 n.2; *see also* 8 U.S.C. § 1182(d)(5)(A) (specifying that humanitarian parole of noncitizens covered by § 1225 "shall not

---

[8] At the Hearing, Respondents conceded that they did not, and cannot, detain Campbell pursuant to § 1226(c).

be regarded as an admission of the [noncitizen]").  Importantly, "[t]his narrowly-tailored legal

fiction exists to accommodate the political branches' broad prerogative to . . . decide which

[noncitizens] to *admit*."  *Al-Thuraya v. Warden*, No. 25-cv-02582 (AS), 2025 WL 2858422, at *3

(S.D.N.Y. Oct. 9, 2025) (citation modified) (citing *Thuraissigiam*, 591 U.S. at 139).  Here,

Campbell is not disputing the government's "sovereign prerogative" to decide who to admit,

*Thuraissigiam*, 591 U.S. at 139; he is challenging his detention while removal proceedings are

ongoing.  Accordingly, "the concern animating the entry fiction exception — that is, the political

branches' authority to legally admit or exclude noncitizens — doesn't apply," because the

government "lacks the authority to remove" individuals like Campbell until there is a final order

of removal issued against them.  *Al-Thuraya*, 2025 WL 2858422, at *4.

Consistent with this understanding, the central concern of historic applications of the

doctrine was the admission or removal of a noncitizen, rather than detention pending an

adjudication.  For example, in *Mezei*, a noncitizen (Mezei) was "permanently excluded from the

United States on security grounds but stranded . . . on Ellis Island because other countries

w[ould] not take him back."  345 U.S. at 207.  The Supreme Court held that Mezei, who had

been conclusively denied entry, remained an "entering alien" despite his detention at Ellis Island

(which was geographically within the United States).  *Id.* at 213.

Likewise, in *Thuraissigiam*, the noncitizen (Thuraissigiam) was detained "25 yards from

the border," *id.* 107, found to lack a credible fear of persecution, and placed in expedited removal

proceedings, *id.* at 114.  The Supreme Court held that Thuraissigiam could not be said to have

"effected an entry" into the United States for constitutional purposes.  *Id.* at 140.  Thus,

"[c]ontrary to Respondents' contentions, *Thuraissigiam* stands for the limited principle that those

'at the threshold of initial entry' stand on a different footing for due process purposes than

noncitizens 'who have established connections in this country.'"  *Rodriguez-Acurio*, 2025 WL

3314420, at *26 (citing *Thuraissigiam*, 591 U.S. at 107); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[Noncitizens] receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.").

Unlike noncitizens just apprehended at the border or held in processing centers, Campbell was paroled into the United States and has called New York home for four years. Pet. ¶ 5. During this time, he has built strong community connections and earned work authorization, all while living peacefully and *without any pending removal proceedings against him. See id.*; Hampton Decl. ¶ 5. "To claim that [Campbell] was never really 'here' thus requires a much greater sleight of hand than is provided for in those prior cases." *Rincon v. Hyde*, --- F. Supp. 3d ---, 2025 WL 3122784, at *6 (D. Mass. Nov. 7, 2025). Simply put:

> Granting the relief requested in *Mezei* or *Thuraissigiam* — initial entrance to the United States (*Mezei*) or a more robust process toward admission (*Thuraissigiam*) — might have genuinely "undermine[d] the 'sovereign prerogative' of governing admission to this country." But the same cannot be said with respect to Petitioner, who merely seeks to continue engaging in the same removal proceedings as before, only not from a jail cell.

*Id.* at *7 (citation omitted) (quoting *Thuraissigiam*, 591 U.S. at 140). Accordingly, the Court recognizes Campbell's actual presence within the United States at the time of his 2025 re-arrest and finds that his detention falls under the provisions of § 1226(a).

   **B.    The Record Confirms that Campbell Falls Within § 1226(a)'s Domain**

DHS's interactions with Campbell further confirm that he is detained under § 1226(a). "[T]he parole of [noncitizens] seeking admission is simply a device through which needless confinement is avoided *while administrative proceedings are conducted.*" *Sesay v. I.N.S.*, 74 Fed. App'x 84, 87 (2d Cir. 2003) (emphasis added) (quoting *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958)). In Campbell's case, however, there were no proceedings being conducted

during his parole.  As Respondents acknowledge, DHS did not commence removal proceedings against Campbell until September 2025 — four years after he had been paroled into the country, and years after his parole expired.  Hampton Decl. ¶¶ 5, 9; *see Öztürk*, 136 F.4th at 397-98 (observing that removal proceedings had not commenced before the government filed an NTA).  This re-arrest, then, was not simply a continuation of Campbell's initial border encounter following the termination of his parole.  It was an independent decision to detain, years after his parole expired and in connection with a new NTA.  Indeed, when DHS arrested Campbell in 2025, it invoked an entirely different basis for detaining him than it had in 2021.  *Compare* 2021 NTA at 4 (citing INA 212(a)(7)(A)(i)(I)), *with* 2025 NTA at 1 (citing INA 212(a)(7)(B)(i)).  By DHS's own characterization, over the four years that Campbell lived in the United States without any pending removal proceedings against him, his status shifted from "immigrant," 2021 NTA at 4, to "nonimmigrant," 2025 NTA at 1.  Thus, while Campbell remained "legally unadmitted" due to his parole status, he "ha[d] arrived" in the United States.  *Rodriguez-Acurio*, 2025 WL 3314420, at *21 (quoting *Coal. for Humane Immigr. Rts. v. Noem*, --- F. Supp. 3d ---, 2025 WL 2192986, at *28 (D.D.C. Aug. 1, 2025) ("[W]hile a Section 1182(d)(5)(1) parolee remains 'legally unadmitted,' they 'have arrived' — i.e., their arrival is complete, whereas their admission is not.")).

    In accordance with that understanding, Section 1182(d)(5)(A) permitted DHS to "return [Campbell] . . . to the custody from which he was paroled," but not without the procedures afforded to any other applicant for admission residing in the United States for years.  *See* 8 U.S.C. § 1182(d)(5)(A) (noting that parolees, upon termination of their parole, "shall continue to be dealt with in the same manner as that of any other applicant for admission").  The procedures governing Campbell's detention were that of § 1226:

> In the ordinary course, if [DHS] discovers that [a noncitizen] is living in the
> United States without authorization, it may initiate removal proceedings against
> the [noncitizen] by sending him a "notice to appear." . . . The INA further
> provides that DHS may arrest and detain the [noncitizen] pending a decision on
> whether the [noncitizen] is to be removed from the United States.

*Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021) (citing 8 U.S.C. § 1229(a) and § 1226(a));

*see also Rodriguez-Acurio*, 2025 WL 3314420, at *18 ("[A]ny other applicant for admission

residing in the United States for more than three years would be detained under Section 1226."

(citing *Tumba Huamani*, 2025 WL 3079014, at *3)). Indeed, in 2025, Respondents "initiated

removal proceedings against" Campbell by presenting him with a new NTA — even though no

notice is required to detain a parolee whose parole has automatically terminated. *See* Opp. at 5

(citing 8 C.F.R. § 212.5(e)(2)(ii) to argue that no written notice was required); *but see* 2025

NTA; 8 C.F.R. § 212.5(e)(2)(i) (stating that a charging document constitutes notice); 8 C.F.R.

§ 244.1 (defining "charging document" to include an NTA). Moreover, when Respondents

detained Campbell in November 2025, they presented him with a warrant pursuant to § 1226(a).

Hampton Decl. ¶ 12; *see also* Warrant at 1 (stating that the warrant is "authorized pursuant to

sections 236 and 287 of the [INA]").[9] These procedures are used for detention under § 1226(a),

not § 1225(b)(2). *See Cuy Comes v. DeLeon*, No. 25-cv-09283 (AT), 2025 WL 3206491, at *3

(S.D.N.Y. Nov. 14, 2025) ("Because Cuy Comes was arrested and detained pending removal

proceedings pursuant to an administrative warrant, and he does not fall into the single exception

for mandatory detention under § 1226(c), Cuy Comes's detention must be discretionary."

(citations omitted)). These facts, taken together establish that in 2025, Campbell was detained

---

[9] When confronted at the Hearing about the Warrant's stated basis for detaining Campbell,
Respondents claimed that § 1226 was cited only to authorize issuance of the warrant, not to
justify detention. The Court finds this explanation unpersuasive. Section 1226 does not concern
issuance authority; rather, it expressly states that, "[o]n a warrant issued by the Attorney General,
[a noncitizen] may be arrested and detained pending a decision on whether the [noncitizen] is to
be removed from the United States." 8 U.S.C. § 1226(a).

not as a noncitizen "seeking admission" under § 1225, but as someone already present in the United States, subject to Respondents' discretionary detention authority under § 1226.

Having found that Campbell is subject to § 1226, the Court next addresses whether his due process rights were violated when DHS re-arrested him in 2025.

## III.    Respondents Violated Petitioner's Due Process Rights

"[T]he Due Process clause applies to all 'persons' within the United States, including [noncitizens], whether their presence is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693 (citation omitted). The Due Process Clause of the Fifth Amendment prevents the Government from depriving any person of "life, liberty, or property without due process of law." U.S. Const. amend. V. "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. The "essence of due process is the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring)). "The Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020).

In the Second Circuit, courts have looked to the *Mathews v. Eldridge* three-factor balancing test when determining the adequacy of process in the context of civil immigration confinement. *Id.* at 851 (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). The test requires the Court to consider: "(1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute

procedures would entail." *Chipantiza-Sisalema*, 2025 WL 1927931, at \*2 (citing *Mathews*, 424 U.S. at 355). As detailed below, applying the *Mathews* balancing test here, the Court finds that Campbell's detention violates due process.

## A. The Private Interest

First, Campbell invokes "the most significant liberty interest there is — the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)). A person's liberty cannot be abridged without "adequate procedural protections." *Zadvydas*, 533 U.S. at 690; *Black v. Decker*, 103 F.4th 133, 151 (2d Cir. 2024) (observing that "[c]ase after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception'" (alteration in original) (quoting *Velasco Lopez*, 978 F.3d at 851)). Here, Campbell was wrongfully detained without an individualized determination of his flight risk or dangerousness. Pet. ¶¶ 6, 8; Br. at 2-3. In petitioning this Court, Campbell "does not contend that greater 'judicial-type procedures must be imposed upon the administrative actions' of [DHS] than those already required by law; [rather, he] argues that the agency must comply with the procedures already in place, and its failure to do so amounts to a complete and arbitrary denial of due process." *Kelly v. Almodovar*, No. 25-cv-06448 (AT), 2025 WL 2381591, at \*3 (S.D.N.Y. Aug. 15, 2025) (quoting *Velasco Lopez*, 978 F.3d at 851).

Detention under 1226(a) must be premised on an individualized custody determination based on the noncitizen's dangerousness and flight risk. *See Velasaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2000), *appeal withdrawn sub nom. Velasaca v. Wolf*, No. 20-cv-02153, 2020 WL 7973940 (2d Cir. Oct. 13, 2020); 8 C.F.R. § 1236.1(c)(8). Here, there is no record evidence that any kind of individualized determination was made as to Campbell. "In fact, nothing in the record reflects . . . (1) who made the decision to detain him, (2) when that decision occurred, (3) on what basis the decision to detain him was made, (4) whether there was any

material change in circumstances with respect to [Campbell] that triggered his detention, or (5) whether there was any sort of new policy in place that triggered his detention." *Lopez Benitez*, 795 F. Supp. 3d at 494.  Rather, DHS, acting pursuant to the wrong statute, deprived Campbell of his statutorily mandated procedural protections.  "The utter lack of transparency here is problematic, to say the least, as it makes it impossible to determine why [Campbell] was detained in the first place." *Lopez Benitez*, 795 F. Supp. 3d at 494.  Campbell's liberty interest is clearly established.

### B.    The Risk of Erroneous Deprivation

Second, the Court finds that the risk of erroneous deprivation is particularly high here. *See Valdez v. Joyce*, No. 25-cv-04627 (GBD), 2025 WL 1707737, at *4 (S.D.N.Y. June 18, 2025) (finding re-detention absent a change in circumstances, procedure, or evidentiary findings established a high risk of erroneous deprivation of liberty interests).  When DHS first paroled Campbell, Dkt. 1-2, "it could not have done so validly unless it did not consider him to be a flight risk or danger to the community at that time." *Lopez Benitez*, 795 F. Supp. 3d at 495; *see* 8 C.F.R § 212.5(b).  Yet, when DHS re-arrested and detained Campbell in 2025, its determination was based solely upon evidence that he "either lack[s] immigration status" or is otherwise "removable."  Warrant at 1; Reply at 8 (noting that DHS provided Campbell with "no individualized explanation of any change in circumstances, and no opportunity to contest his redetention before it occurred").  DHS's "fail[ure] to articulate any change in circumstances between the time of [Campbell's] initial release in [2021] and his re-detention in 2025" demonstrates its procedures' deficiencies. *Lopez Benitez*, 795 F. Supp. 3d at 495 (citation modified).

### C.    The Government's Interest

Lastly, DHS's "discretion to detain individuals under 8 [] U.S.C. [§] 1226(a) is valid where it advances a legitimate government purpose," such as "ensuring the appearance of [noncitizens] at future immigration proceedings and preventing danger to the community." *Valdez*, 2025 WL 1707737, at *4 (quoting *Velasco Lopez*, 978 F.3d at 854); *Zadvydas*, 533 U.S. at 690.  Here, there is substantial record evidence that Campbell is *not* a flight risk or a danger to the community.  In the four years that Campbell has resided in the United States, he has filed for asylum, obtained work authorization, provided updated address information to DHS, established community ties in New York, and maintained a clean record.  Pet. ¶¶ 4-5; Reply at 1.  Indeed, Campbell's compliance with DHS's Call-in letter, culminating in his arrest at the ICE field office, demonstrates that he was not a flight risk.  Respondents have not pointed to any evidence that Campbell posed a risk of flight or danger to the community sufficient to justify his detention, nor was that even evaluated at the time of his detention.  Thus, Respondents have failed to show a significant interest in Campbell's continued detention.[10]

### IV.    Petitioner Is Entitled to Immediate Relief

Though Respondents did not argue that administrative exhaustion is required, in an abundance of caution, the Court will consider whether exhaustion, in the form of a bond hearing

---

[10] The weight of Campbell's interest in being free from imprisonment coupled with DHS's failure to exercise *any* discretion in detaining Campbell — in contravention of its obligations under § 1226 and its implementing regulations — is alone sufficient to establish a due process violation when he was detained.  8 C.F.R. § 1236.1(c)(8).  Indeed, at least one court in this District has found that the *Mathews* test need not be applied where, as here, the petitioner "argues [and the record supports] that [his] detention was illegal from the start because of the lack of any due process," rather than contesting the length of his detention.  *Tumba Huamani*, 2025 WL 3079014, at *8-9 (citing earlier decision in *Rojas Acevedo v. Almodovar*, No. 25-cv-07189 (LJL), 2025 WL 3034183, at *8 (S.D.N.Y. Oct. 30, 2025)).  As set forth above, even applying the *Mathews* test, the outcome is the same.  Respondents denied Campbell his due process.

before an immigration judge, is required before the Court may grant Campbell's requested relief

of release from DHS custody.  Although courts generally require "administrative exhaustion

before immigration detention may be challenged in federal court by a writ of habeas corpus,"

*Quintanilla v. Decker*, 21-cv-00417 (GBD), 2021 WL 707062, at *2 (S.D.N.Y. Feb. 22, 2021)

(quoting *Joseph v. Decker*, No. 18-cv-02640 (RA), 2018 WL 6075067, at *5 (S.D.N.Y. Nov. 21,

2018)), exhaustion is a prudential, not statutory, requirement, *id.*  There are "a number of

exceptions" to the application of discretionary exhaustion requirements, including when "(1)

available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may

occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in

certain instances a plaintiff has raised a substantial constitutional question."  *Beharry v. Ashcroft*,

329 F.3d 51, 62 (2d Cir. 2003) (Sotomayor, J.).  The Court finds that two of the exceptions to

exhaustion apply here: Campbell is excused from administrative exhaustion because he has no

genuine opportunity for adequate relief and has raised a substantial constitutional question.

First, a custody re-determination pursuant to 8 C.F.R. § 236.1(d) is an inadequate remedy

because there is no initial DHS decision to review.  DHS did not *abuse its discretion* in detaining

Campbell; it exercised *no discretion at all*.  Having re-detained Campbell pursuant to the wrong

statute, DHS afforded him no process.  "[T]he [g]overnment's violation of [his] constitutional

rights originated with [his] detention in the first instance."  *Tumba Huamani*, 2025 WL 3079014,

at *7.  Section 1226's implementing regulations state that bond hearings "are provided for the

purpose of custody *re*-determination — a hearing held by an immigration judge *after* [DHS]

makes its initial decision to detain."  *Kelly*, 2025 WL 2381591, at *3 (citing 8 C.F.R. § 236.1(d))

(former emphasis in original); *see* 8 C.F.R. § 236.1(d)(1) ("After an initial custody

determination . . . the respondent may . . . request amelioration of the conditions under which he

or she may be released.").  "Such a hearing is no substitute for the requirement that DHS engage

in a 'deliberative process prior to, or contemporaneous with,' the initial decision to strip a person of the freedom that lies at the heart of the Due Process Clause." *Chipantiza-Sisalema*, 2025 WL 1927931, at *3 (quoting *Sessions*, 2018 WL 2932726, at *15). Because Campbell's petition challenges his 2025 re-arrest that was effected with no individualized determination, "there is no . . . decision" for him to "appeal." *Lopez Benitez*, 795 F. Supp. 3d at 497.

Second, there is no doubt that — like others placed in the same position by the government's untethered reading of § 1225 — Campbell's Petition raises a substantial constitutional question that cannot properly be adjudicated administratively. *See, e.g.*, *Kelly*, 2025 WL 2381591, at *3. Here, Campbell does not merely seek an opportunity to contest his detention. Instead, he argues that his detention under § 1226 absent an individualized assessment is a violation of his due process rights. Br. at 2-3. Neither an immigration judge nor the BIA has jurisdiction to adjudicate constitutional issues. *See Quintanilla*, 2021 WL 707062, at *2. They are therefore not "positioned to properly adjudicate [Campbell's] claim." *Lopez Benitez*, 795 F. Supp. 3d at 497. The Court finds that "[i]n light of the deprivation of [Campbell's] liberty, formerly granted and approved by Respondents, the absence of any deliberative process . . . , and the statutory and constitutional rights implicated, a writ of habeas corpus is the only vehicle for relief. It is, in essence, the most appropriate remedy." *Sessions*, 2018 WL 2932726, at *15.

In sum, both DHS's failure to follow its own regulations and its failure to afford Campbell the minimal process due under the Fifth Amendment violated Campbell's due process rights. Because of those failures, Campbell is entitled to release.

## CONCLUSION

The petition for a writ of habeas corpus is GRANTED. Respondents are directed to release Campbell from custody by **December 10, 2025 at 12 p.m.** and certify compliance with

the Court's order by filing an entry on the docket no later than **December 11, 2025 at 5 p.m**.

The Clerk of Court is respectfully requested to close this case.

Dated:  December 10, 2025
      New York, New York

                                     SO ORDERED.

                                     JENNIFER L. ROCHON
                                     United States District Judge